## GIBBS et al. v. T. Z. R. AMUSEMENT CORPORATION et al.

### No. 7717.

District Court, E. D. New York.
May 26, 1936.

958

Max D. Ordmann, of New York City, for plaintiffs.

Darby & Darby, of New York City (Samuel E. Darby, Jr., and Floyd H. Crews, both of New York City, and Jacob B. Steinfeld, of Brooklyn, N. Y., of counsel), for defendants.

BYERS, District Judge.

This is a patent infringement suit in which the patentee and an exclusive licensee to use are the plaintiffs, and a corporation and four of its individual stockholders are the defendants.

The patent is No. 1,906,260 issued to the individual plaintiff, Gibbs, on May 2, 1933, on application filed February 16, 1931.

The device is a game suitable for operation in an amusement park or other public place, and is composed of a selected number of identical units each one of which is operated by an individual player; each unit consists of a board supported in a horizontal position and, connected thereto, a vertical part called an annunciator.

The player is seated at the end opposite the annunciator, and rolls a ball toward the other end of the board over or around an obstacle, in the direction of the annunciator; the object is to cause the ball to fall successively into a vertical, horizontal or diagonal row of five of the twenty-five holes which are symmetrically arranged in five rows, equally spaced apart. The hole pockets are connected electrically with the annunciator, which contains twenty-five electric light signals aligned to correspond with the arrangement of the holes on the playing surface of the table; as the ball enters one of the holes, it falls into a pocket and energizes an electric circuit whereby the corresponding signal is illuminated in the annunciator; the ball re-

turns to the player through an inclined surface provided under the playing board for that purpose, but the light which it has kindled, i. e., the circuit which it has closed, is not affected by the return of the ball to the player.

The object of the player, as stated, is to cause the ball successively to enter five holes in a vertical, horizontal or diagonal row. When he has done this, the annunciator indicates the success of his efforts by displaying five lights in such a row.

The simultaneous operation of a number of boards, at which different players are seated, affords the element of competition and the playing units are so connected by a scheme of electric wiring that the first player who succeeds in achieving the result indicated becomes the winner over his competitors; his success is indicated by the lighting of a light over his annunciator, i. e., the closing of a supplementary circuit, and the ringing of a bell, and the simultaneous cutting off of all illumination in the annunciators connected with competitive boards.

A game which terminates when a player has completed a row of five units bearing numbers and played with cards, is not new; a game which involves rolling a ball into one or more holes and a consequent visible signal in an annunciator is not new, but this particular combination of playing board, annunciator, and cut-off of competing boards when a winning combination of five in a vertical, horizontal or diagonal row has been achieved, is new; a considerable commercial success has attended the introduction and operation of this game in amusement parks during the years 1931 to 1935, inclusive, and such commercial success in connection with the plaintiffs' patented device is found.

The defendants' device is so like the plaintiffs' that little or no contention is made on the subject of infringement; such argument as the defendants make, goes to the system of wiring only and, as that does not form an element of any of the claims, an exit from the litigation is not thus rendered available to the defendants.

Much of the testimony has to do with the nature of the defendants' conduct in putting their game into operation after they had been afforded an opportunity to examine the plaintiffs' game in the concession operated by the corporate licensee at Coney Island during the month of June, 1935, which was later than the success of

the Gibbs game had become well known in public amusement circles.

The defendants insist that one or more of them independently conceived the idea of putting such a game into operation and that they consulted a practical electrician during the month of May, 1935, and asked him to devise the wiring, and that at that time they had no knowledge of the plaintiffs' patent or of the game itself. It is possible, of course, that the defendants' activity in 1935 along these lines was purely fortuitous and, as the questions of infringement and validity do not turn upon this subject, no finding will be made; the testimony of certain of the defendants created serious misgivings as to their good faith; they might better have frankly said that they did not regard the plaintiff's patent as valid and that they were willing to risk a possible infringement suit in order to test the question, than to depose as they did in certain respects.

Certain contentions urged on behalf of the defendants require consideration before taking up the question of validity:

First, it is urged that there is a defect in the parties plaintiff, in that the Cannon Electric Development Company, Inc., of Los Angeles, California, is not so joined, and that it should be because "the patentee has granted an exclusive license to manufacture under the patent" to that corporation. Reference is made to an agreement bearing date December 19, 1930—nearly two months prior to the filing of the application for the patent. That agreement is in evidence and is plainly not the work of an attorney; it is written on the letter-head of the Cannon Company and is described by Mr. James H. Cannon, the president, as the original agreement which he had at the time he built the first games: "The games were actually started under construction before this was written due to the fact that I produced them with an unknown cost element; and the understanding was that we would finish the games and then determine the cost afterwards. And the contract was delayed until the completion of the units. The units were started in October some time and the contract was signed in December, as I recall it."

The document is called an agreement between J. R. Prosser, John T. Gibbs and the Cannon Electric Development Co. based on a memorandum of October 29, 1930, and adapted to subsequent developments. It reads:

"First, that the Cannon Electric Development Co., is entering into this agreement as a sales promotional measure believing that the game, if successfully designed and perfected, will offer a substantial piece of manufacturing business to the company.

"For and in consideration of the Cannon Company perfecting the game and the design of the equipment and helping to finance the first unit in its preliminary stages, they are to receive the exclusive manufacturing rights to same.

"That they are to build the game at a price based on cost plus a nominal overhead expense and a reasonable profit. This price being subject to change from time to time to meet the conditions that develop in the improving and marketing of the game, it being tentatively set at the present time for resale purposes at $217.00 net cash per unit in lots of thirty or more. Lots of twenty to thirty an increase of 5% and lots of less than twenty and not less than twelve, 10% additional to this figure. As a starting price it is understood that $50.00 per unit will be added to these figures as commission to Gibbs and Prosser.

"Second, Gibbs and Prosser are to hold the exclusive selling privileges on the game and the sales will only be made under mutual agreement of all parties to this contract.

"Third, that the price on the original game as now built is $202.50 net per unit.

"Fourth, The established cost on the completed first game is $6,090.35 of this Gibbs & Prosser are to pay in cash $2,400.00 and an additional $600.00 represented by a ninety day promissory note bearing seven per cent interest. The remaining $3,090.35 is to be derived from the sale of the game by adding to the net price, as before mentioned, such amount as may be mutually agreed from time to time.

"Fifth, That the Cannon Company holds exclusive title to the games consecutively numbered from 21 to 30, inclusive, and is to retain such title until the promissory note herein involved is paid in full. Partial payments on the note applying toward the purchase of the first 20 games.

"Sixth, It is understood that within a reasonable time Gibbs & Prosser will apply

for patent protection on the game for the mutual protection of all parties concerned.

> "Signed
> "Cannon Electric Development Co.
> "By James H. Cannon, Pres.

"John T. Gibbs   ˌReceipt is hereby ac-
"J. R. Prosser    knowledged of receipt of $2,400.00 in cash & promissory note for $600.00.
> "J. H. Cannon."

It is difficult to understand how this can be construed as an exclusive license under a patent which was applied for almost two months after the agreement was made. For present purposes, the agreement is thought to reflect the then intention of the parties that:

(a) A sales promotional measure was recited that was calculated to bring substantial business to the Cannon Company.

(b) To the latter end, an undertaking was given by the latter to perfect the game and the design and to assist in financing the first unit in its preliminary stages, and in consideration of the Cannon Company's so doing, "they (sic) are to receive the exclusive manufacturing rights to same."

(c) The manufacturing price was to be established as stated.

(d) Exclusive selling privileges were to pertain to Gibbs and Prosser, and sales were to be made "under mutual agreement of all parties to this contract."

(e) The method of paying the cost of the first unit by Gibbs and Prosser was to be as recited, including the retention of title in ten of the games until the completion of payment.

(f) Gibbs and Prosser agreed to apply for patent protection "for the mutual protection of all parties concerned."

At most, this was an undertaking that an exclusive license to manufacture would be granted to the Cannon Company at some time after the patent was issued, and there is no proof that this has ever been done.

Perhaps the Cannon Company may insist upon receiving such a license, but it does not lie with these defendants to assert that such a license has ever been issued, in the absence of testimony to that effect.

Cannon's testimony is consistent with his company's having built the games and supervised the installation thereof in the Kahn Amusement place in June of 1935, from which it may be inferred that, since the patent was granted, the parties have entered into an arrangement which is satisfactory to them, but whether that is an exclusive license or not cannot be ascertained from the evidence in this case.

The circumstances are quite at variance with those examined in the case of Radio Corporation of America v. Emerson (C.C. A.) 296 F. 51, upon which the defendants rely.

It is found that the evidence does not sustain the assertion that the Cannon Electric Development Company is a licensee under the plaintiff's patent, and it is concluded, therefore, that there is no defect in parties plaintiff.

◼ Next, it is asserted by the defendants that the plaintiff Gibbs is not the sole inventor of the device covered by the patent.

That assertion is largely based upon the testimony of Gibbs concerning his contribution to the invention; that is to say, the extent to which he conceived not only the results which he wished to achieve in his completed structure but his understanding of the method whereby that result could be accomplished. The only testimony on the subject is that of Gibbs. He said:

"My contribution to the final design was a crude wiring scheme of it at first. From that he (Cannon) took the general line of it. In some phases he put short cuts in, in other phases he added his own work to it, from that point on, and completed the game.

"Q. Can you agree with this statement, that you supplied the idea and he supplied the electrical layout? A. I supplied the idea and I also disclosed circuits to him on it.

"Q. You also disclosed the circuits? A. I also disclosed the circuits, which he readily understood.

"Q. Now we are getting down to the meat of it. Is it your testimony that you disclosed the circuits of the layout to Mr. Cannon? A. In a very crude manner, yes."

The witness said that he made a drawing for Cannon, and he executed a similar one at the final hearing, which the defendants offered.

Gibbs had no documentary evidence, such as a note book or collection of sketch-

es, preserved from his early interviews with Cannon, but his testimony creates the distinct impression, and is accordingly found to establish, that he originally communicated to Cannon not only the result which he desired to arrive at, namely, the final form of the game, but such a conception of the instrumentalities of accomplishment that Cannon was able thereafter to perform the purely mechanical function of embodying the conception of Gibbs into an operative structure or group of structures such as are described in the patent.

The invention therefore was that of Gibbs; if the defendants ever seriously entertained the purpose of establishing that Cannon participated in the invention, they had ample opportunity to do so on the cross examination of Cannon at the time his deposition was taken in Los Angeles.

His testimony is that Gibbs conceived the game and the method of play. If Cannon had thought of himself as a co-inventor with Gibbs, he would have so described himself in the document to which previous reference has been made, and upon which the defendants profess to rely in connection with their argument that there is a defect in parties plaintiff.

■ Turning now to the question of validity:

The claims of the patent are as follows:

"1. A game apparatus comprising a board having a plurality of apertures, electrical contacts adjacent each of said apertures, an annunciator having a plurality of electrical indicators thereon corresponding in number with said apertures, said indicators and said apertures being subdivided into corresponding groups, means for electrically connecting said contacts with the corresponding indicators, means for supplying electric current to said indicators, a plurality of relays in the circuit of said indicators adapted to be energized when a ball is dropped thru said apertures into engagement with said contacts, and armatures associated with said relays having contact devices thereon registering with fixed contacts on said annunciator, whereby when each of said contacts has been momentarily operated by said ball, said relays and said indicators will be energized and said armature contacts will be caused to engage said fixed contacts, and subsequent to the opening of said contacts the circuit of said relays and said indicators will remain closed.

"2. A game apparatus as characterized in claim 1, including a master signal connected in the circuit of said indicators and adapted to be energized when all of the indicators in any of said groups have been energized.

"3. A game apparatus comprising a board having a plurality of contact devices thereon adapted to be engaged by an object moved over the board by a player, a plurality of indicators, means for electrically connecting said indicators with a source of electric current and with said contact devices, said indicators and said contact devices corresponding in number and arrangement and subdivided into corresponding groups, means for energizing said indicators as the associated contact devices are operated, an electrical circuit common to all of said groups and open until all of the indicators in one of said groups have been energized, and supplementary means for indicating a winning play when all of the indicators in one of said groups have been energized.

"4. A game apparatus comprising a board having a plurality of contact devices mounted thereon, a corresponding number of indicators also mounted thereon and electrically connected with the contact devices respectively, said indicators and said contact devices being of corresponding number and subdivided into corresponding groups, a relay and an armature therefor in the circuit of each of said indicators, movable contacts on said armatures, fixed contacts normally spaced from said armature contact, and connections whereby when an object is moved by a player into engagement with said contacts said contacts will be momentarily closed for initially closing the circuit of the corresponding indicators and relays, thereby engaging the corresponding armature contacts with the associated fixed contacts for closing the circuit of said indicators and relays when said first mentioned contacts are again opened, and means for connecting the several indicators of each group for maintaining an open circuit of all of the groups until all of the indicators of one group have been successively energized.

"5. A game apparatus as characterized in claim 4, including a signal connected with said groups of indicators and adapted to be energized when all of the indicators of any group have been energized.

"6. A game apparatus comprising a plurality of units electrically connected together, each of said units including a plurality of contact devices and a plurality of indicators corresponding in number and subdivided into corresponding groups, means for electrically connecting the contact devices with the corresponding indicators, means for electrically connecting said units together and with a source of electric current, said indicators adapted to be operated when and as objects are moved by the players into engagement with the contact devices, and means whereby when all of the indicators in any group of any one of said units have been operated to complete a winning play, the indicators on all of the units except the winning unit will be deenergized, while the indicators at the winning unit will remain energized, for the purpose described.

"7. A game apparatus as characterized in claim 6, including an independent supplementary signal at each of said units for signaling a winning play to the players.

"8. A game apparatus as characterized in claim 6, including an independent supplementary signal at each of said units for signaling a winning play to the players, and means under the control of an operator for opening and closing the circuits of all of said units simultaneously at will.

"9. A game apparatus comprising a plurality of electrically connected units, each including a game board with a plurality of apertures therein, and an annunciator with a plurality of indicators thereon, electrical contacts adjacent each of said apertures connected in the circuits of said indicators, said indicators and said apertures corresponding in number and subdivided into corresponding groups, whereby when objects are deposited in said apertures by the players at the several units corresponding indicators will be energized, a supplementary signal circuit on each of said units, and means for holding said signal circuit open until all of the indicators of any group on each of said units have been energized, and for closing said signal circuit when all of the indicators of any unit have been energized, and means controlled by the closing of the signal circuit of the winning unit for discontinuing the signals and opening the circuits of the indicators on all other units.

"10. A game apparatus as characterized in claim 9, including an audible signal commonly connected with all of said units and adapted to be operated upon the closing of the supplementary signal circuit of any of said units."

In connection with these claims, it should be stated that for successful operation of the Gibbs games two requirements are present:

(1) The annunciator signal which has been lighted as the result of the falling of the ball into a given pocket must remain lighted, as the result of that contact between the ball and the switch which causes the light to show, after the ball has left the pocket and returned to the player, which means that a circuit so energized has to remain closed even though the ball has so surrendered contact. And this result must not be changed, even though, through misadventure, the ball should again fall in the same pocket. The first five claims are thought to disclose this requirement.

(2) When a row of lights has been completed, either vertical, horizontal or diagonal, on one board, all illumination on all other boards must be extinguished and prevented until the play starts again on all boards, so that, for instance, if the winner is seated at board 7, a player on board 9 not only finds all lights in his annunciator extinguished as the result of the completion of the row on board 7, but he may not thereafter cause any light to show in his annunciator by dropping the ball in any pocket on his board. If the latter result could not be accomplished, non-winning competitors might insist upon remaining at their boards and continuing their own individual play.

Claims 6 to 10 are consistent with this requirement. Probably claim 9 discloses both.

These two results are novel and, while they are accomplished through the employment of relays long known to the wiring art, no combination of those relays prior to that of Gibbs operates as does that of the patent in suit, and no previous combination of old devices of any kind has produced the game invented by Gibbs. Therein lies the novelty of the plaintiff's patent, and the achievement by him of this new result was deemed by the Patent Office to constitute invention over certain of the patents upon which the defendants now rely:

*Nakashima, No. 1,678,573*

This patent covers a game for one player; he rolls at least three balls, on such a table as in the plaintiff's patent, in an attempt to have them fall and rest in three designated prize-winning apertures or holes among a group of thirty; as each ball falls in one of the winning holes designated by a star, a current is actuated which lights a lamp in an annunciator, but only the prize-winning apertures are wired to the annunciator, so that, if the ball falls into any other hole, there is no electric switch with which it may make contact, and consequently there is no result of such a play shown by the annunciator. If any of the balls in a prize-winning pocket becomes dislodged before all the prize-winning pockets are occupied, the contact is broken, and the ball must again enter that pocket before a winning combination is scored (lines 83–86, p. 1, and the two claims).

This feature sharply distinguishes the two games, so far as the relation between the scoring pockets and the annunciator is concerned. In the Gibbs game, a pocket once scored continues to the player's credit so long as the competition continues. Without that feature, the progressive aspect of the game would not be possible.

The only resemblance between the Nakashima patent and any of the first five claims of the Gibbs patent is the cooperation of the annunciator, which has been explained. Thus, if there are thirty apertures or holes in which the ball may fall, as shown in figure 1 of the drawing, at least twenty-four of them could be occupied successively by some of the balls without visible result in the annunciator.

This is a game for one player and conceivably he might operate it for an hour before causing a ball to fall in any or all of the winning pockets. The mere fact that there is an electrical connection between the latter and the annunciator does not constitute Nakashima an anticipation of the game taught by Gibbs. The allowance of the latter's patent over this one by the Patent Office was quite justified.

*Esmarian, No. 1,612,912*

This patent is even more remote and for present purposes may be regarded as falling in the same class of game as that of Nakashima.

None of the other patents referred to on the argument or the briefs involve a cut-off or other device intended to promote competition on the part of several players using several game tables simultaneously.

*Irsch, No. 1,433,888*

This patent does involve the cut-off principle and provides a group game in which a number of players may compete, each employing one device, of a plurality of similar devices, for causing a ball to be projected across a counter into a trough where it will roll down and strike a spring contact, pressing the same against a stationary contact which closes an electric circuit. The first ball which accomplishes this result wins and all others are automatically prevented from scoring because the second ball, for instance, in point of time, which otherwise would make the electric contact in its own trough, is prevented from doing so by the prior contact made with a switch by the first ball.

There is an annunciator which does not contain lights but probably a drop or some other visible means of indicating the winning ball. The cut-off seems to be described in claim 10 of this patent and is relied upon by the defendants to render the plaintiff's patent invalid.

It is necessary to bear in mind that the Irsch game is very different from that described in the Gibbs patent, and to weigh the contention that the mere presence of a cut-off in the Irsch device deprives Gibbs of invention.

The several players of the Gibbs game compete for a result which can be achieved only through the exercise of skill in successively illuminating five annunciator lights in a row, as has been described; that skill involves something more than the speed and trajectory with which one ball is projected at a given object, which is all that is involved in the Irsch patent.

In order to encourage each player of the Gibbs game to persist in his efforts, his annunciator proclaims the progress that he is making in seeking to establish his five-light combination, and the precision with which he guides the one ball with which he plays, and so controls its movements, is manually employed and is more directly manifested than in the Irsch game, which involves the pulling of a cord which actuates the impelling force that causes the ball to be projected for the purpose of accomplishing the result stated in connection with that patent.

The way in which Gibbs conceived the method for exciting the prolonged interest of each of the players—and there may be twenty or more—in accomplishing the ultimate purpose of his efforts, by so contriving his annunciator, and the switches and relays which actuate it, that the lights will be continuously displayed (even though the ball should fall in the same hole on several of its trips) so that the row is successively built up toward completion over a period of time, is not the least interesting feature of the game, and there is nothing of that element present in the Irsch game.

The office of the cut-off in Gibbs has heretofore been explained and will be seen to be quite different from that visualized by Irsch.

It is concluded that neither Nakashima nor Irsch teaches the game invented by Gibbs, nor the precise instrumentalities whereby the results are accomplished, and it is accordingly concluded that the Gibbs patent is valid, and involves invention over both of the patents which have been discussed.

It is urged by the defendants that no decree can issue against the individuals because their activities as set forth in the evidence have been purely those of the corporation.

The court does not take that view of the situation. The corporation was so little understood by the defendants that Rapps, the secretary, deposed that the stockholders are the wives of Messrs. Cohen, Taffet and Zundel, while the president, Irving Taffet, stated that the one hundred shares, having a par value of $50.00 each, are owned as follows: Irving Taffet, 25 shares; Samuel Taffet, 25 shares; Herman Rapps, 25 shares, and Samuel Zundel, 25 shares. This discrepancy in the testimony is scarcely consistent with the existence and operation of a corporation which was anything more than a mere instrumentality whereby the several individual defendants have carried on their enterprise. In more than one place in the testimony, the defendants speak of one another as partners, and there is certainly no reason to suppose that there was any well defined difference between the individual and the corporate acts when these defendants employed Ebert, their electrician, to devise a system of wiring for their game and supervised its installation; or when they interviewed Kayser and visited his plant to observe what he had to offer, for the same purpose.

It seems that they not only copied the plaintiffs' game but caused theirs to be advertised by a conspicuous sign as a "fascinating pastime," which probably it is, in their competition with plaintiffs' game which is known as Fascination.

It is concluded that the plaintiffs are entitled to the usual decree of injunction against the defendants, and to an accounting.

If the foregoing is not deemed a sufficient compliance with Equity Rule 70½, (28 U.S.C.A. following section 723), findings may be settled in connection with the decree in accordance with the foregoing.